## CIRCUIT COURT OF THE CITY OF RICHMOND

First Health Services Corp.

v.

Commonwealth of Virginia,
Department of Information Technology, et al.

November 14, 1994

Case No. HE-715-4

BY JUDGE RANDALL G. JOHNSON

This action is brought under the Virginia Public Procurement Act, Va. Code § 11-35 et seq. Under the Act, a procurement award may be reversed if an unsuccessful bidder establishes that the award "is not an honest exercise of discretion, but rather is arbitrary or capricious or not in accordance with the Constitution of Virginia, statutes, regulations or the terms and conditions of the Invitation to Bid or Request for Proposal." Va. Code § 11-70(C). The award at issue is for the installation, testing, and maintenance support of an integrated interactive computer system to provide fiscal agent services to the Virginia Medical Assistance Program. The procuring agency is the Department of Information Technology, which is one of the defendants in the present suit, and which is charged by statute with responsibility for assisting state agencies in matters related to information and communications systems. There were only two bidders: First Health Services Corporation, which is the plaintiff; and Electronic Data Systems Corporation (EDS), which has intervened as a defendant.

The computer system to be provided in response to DIT's procurement action is for use by the Department of Medical Assistance Services (DMAS). In basic terms, the purpose of the system is to process Medicaid claims. While the major emphasis in the Request for Proposal (RFP) ap-

pears to have been on the component of the system dealing with Medicaid Management Information System operations (MMIS), the system will also include bank account management, claims processing operations, maintenance and modification, and operation of the State and Local Hospitalization program and the Long Term Care Information System. Since the early 1970's, these services have been provided to DMAS by First Health. In 1993, however, DMAS decided that the current system was outdated. As stated in the RFP:

> The expiration of the current MMIS contract presents the Commonwealth with the timely opportunity to move forward and to take a proactive role in meeting the challenges presented by . . . new programs. In this undertaking, it is clear that the capacity and capabilities of the current system to meet the new goals, objectives, and standards of the planned Virginia MMIS cannot accommodate the major enhancements needed.

Plaintiff's Exhibit 24, at 1-1.

From the evidence presented by defendants, a major factor in DMAS' decision to obtain a new system was its dissatisfaction with First Health, a point which First Health vigorously contests. In any event, the RFP for a new system was issued on November 30, 1993. As already noted, the only bidders for the new contract were First Health and EDS.

First Health challenges the award on three grounds. First, First Health claims that DIT's decision to award the contract to EDS was arbitrary and capricious. Second, First Health contends that the award was not in accordance with state and/or agency regulations. And third, First Health argues that the award was tainted by an appearance of impropriety which mandates that the award be reversed. Each of these challenges will be discussed separately.

## I. Arbitrary and Capricious

First Health's challenge to DIT's award on the ground that it was arbitrary and capricious centers around one of the technical requirements of the RFP. Specifically, the RFP requires that when a user of the MMIS system wishes to make an inquiry into the system, the time from the moment he or she presses the "Enter" key on the keyboard until the information is displayed on the monitor must be 2 seconds or less 98% of the time. Plaintiff's Exhibit 24, at 5-146. When a user wishes to make an update onto the system, the response time — again from pressing the

"Enter" key until monitor display — must be 5 seconds or less 98% of the time. *Id.* It is First Health's contention that EDS has consistently failed to demonstrate that it can meet these response times, and that DIT's willingness to overlook that fact shows that the award was arbitrary and capricious. The court disagrees.

Without getting too technical, part of the required system involves a "two-platform" database. One platform is called the Information Retrieval Platform, or IRP. The other platform is called the Transaction Processing Platform, or TPP. In order to access either platform, a user presses the "Enter" key on a keyboard. The command travels through DMAS' "local area network," or "DMAS LAN," into one of the platforms where the information is retrieved or updated, back onto DMAS LAN, and onto the user's monitor. As noted earlier, DIT's requirement measures response time from keyboard "Enter" to monitor display. In other words, the time the transaction is in DMAS LAN *plus* the time it is in one of the platforms must be 2 seconds or less for inquiries, and 5 seconds or less for updates, 98% of the time. In its initial response, EDS stated that for purposes of its proposal, response time consisted only of the time the transaction is in one of the platforms, not the total time it is in the system. Even then, EDS would not commit to meeting the 2-second requirement. With regard to the IRP platform, and contrary to DIT's 2-second requirement *98% of the time*, EDS said:

> The Information Retrieval Platform (IRP) of the new Virginia MMIS will permit inquiry transactions against on-line IRP databases to be performed in two seconds or less, *on average.*

Plaintiff's Exhibit 118, at Tab 6, Form 5.6.7, page 1 (emphasis added).
The proposal was even less promising with regard to the TPP platform:

> Inquiries against the TPP databases, while routinely available and responsive to DMAS, will not be timely enough to support this specific two-second requirement.

*Id.,* p. 2.

DIT was not satisfied. Accordingly, as was allowed by § 2.9.3 of the RFP (Plaintiff's Exhibit 24, at 2-10), and as it did with regard to several other matters in *both* proposals, DIT sent to EDS a request for clarification. Plaintiff's Exhibit 125, at 14. The request reiterated DMAS' response

time requirement, and asked EDS if it would comply. In response, EDS said:

> EDS understands the critical nature of a responsive MMIS to DMAS and will meet all response time requirements as defined by DMAS in the RFP.

It is First Health's position that in light of EDS' initial equivocation on the response time requirement for the IRP platform, and its actual statement that the requirement would not be met on the TPP platform, DIT's acceptance of EDS' final response was arbitrary and capricious. First Health's argument fails for several reasons.

First, DIT did not simply accept EDS' bald assertion that it could meet the 2-second requirement. Both Joseph Teefey and Edmund Butler, two members of the selection committee, testified that EDS gave a very lengthy and very technical explanation of the reasons for its initial response, as well as how the requirement would be met. In addition, both men went, with others, on a site visit to Indiana, where EDS had a system in place, and where EDS representatives gave a further explanation. The court accepts the testimony of those witnesses.

Second, several witnesses testified, and several documents show, that EDS' proposal was technically superior to First Health's. For example, in Plaintiff's Exhibit 114, which is an internal First Health memorandum setting forth proposed cost/pricing considerations, even First Health concedes:

> Because of EDS' experience in this operating environment, coupled with [First Health's] lack of same, EDS' technical proposal will be scored ahead of [First Health's]. In addition, if they adopt the same pricing strategy as 1988; i.e., bid at cost, they will win.

It stands to reason, then, that if First Health can meet the 2-second requirement, EDS can, also.

Third, the testimony of First Health's expert witness, Dr. Walter Culver, actually supports defendants. Specifically, Dr. Culver testified that based on the information which the selection committee had, reasonable people could disagree on how EDS' system will perform. That being the case, the exercise of discretion by the committee in awarding the contract to EDS cannot properly be challenged as arbitrary or capricious.

Fourth, the overwhelming weight of the evidence is that EDS will, in fact, meet the 2-second requirement. Such evidence, which is somewhat

technical, came from the testimony of selection committee members, EDS employees, and EDS' expert witness. For example, and without getting too technical, the testimony of Joseph Teefey was that the requirement will be met by using a "double-board," with the system deciding which board to use for any particular request. In the words of Teefey or another witness (I forget who), "it's really no big deal" to meet the requirement. In any event, if the evidence presented at trial is sufficient to convince this court that the 2- and 5-second requirements will be met by EDS, which it is, such evidence, which was also before the selection committee, was certainly sufficient for the committee to make the decision which it made. Such decision was not arbitrary or capricious, and this challenge by First Health must fail.

## II. *Violation of Regulations*

First Health's next challenge to DIT's award is its contention that various *regulations and RFP standards were violated during the procurement process.* At trial, First Health used a "shotgun" approach in attempting to support this challenge. For example, considerable time was spent establishing that six of the eight selection committee members were DMAS employees, something which First Health suggested was improper. The Virginia Agency Procurement and Surplus Property Manual provides, however, that:

> The majority of the [selection] committee . . . may not consist of employees from a single agency *without the approval of the DIT/PCD Director.*

Plaintiff's Exhibit 1, at 9-12 (emphasis added). "PCD" is the Director of Procurement and Contracting.

Thomas Goodbody, the DIT/PCD Director, testified that he approved the makeup of the selection committee, and that the number of DMAS employees reflected the technical and job-specific nature of the contract being awarded. There is simply no merit to this aspect of First Health's challenge.

First Health's real challenge with regard to alleged violations of regulations and RFP standards involves what *First Health contends was improper* record keeping by the selection committee, including the actual shredding of committee members' notes and preliminary scores. Specifically, it is First Health's position that by destroying committee members' individual notes and preliminary scores, DIT violated several rules requir-

ing "adequate record keeping." *See, e.g.*, PX 1, at 2-6 and 10-1. Again, the court disagrees.

It is true that applicable regulations require a procuring agency to keep adequate records of the procurement process. For example, the previously referred to Agency Procurement and Surplus Property Manual provides:

> The purchasing office awarding a contract or purchase order is responsible for maintaining all records relating to that contract. A record must be established for a procurement transaction which has reached the solicitation stage. It must contain as a minimum the description of requirements, sources solicited, a copy of the Virginia Business Opportunities notification form DRS-41033 as applicable, the method of evaluation and award, a signed copy of the contract or purchase order, comments on vendor performance, and any other actions relating to the procurement transaction.

*Id.*, at 10-1.

First Health argues that the above requirement is necessary so that the "who, what, when, why, and how" of a procurement process can be determined. While the court agrees that an adequate record of a procurement transaction must be maintained, the court does not interpret that requirement as meaning that every single piece of paper generated during the process must be kept.

In this case, literally thousands and thousands of documents were created. The vast majority of those documents still exist and were made available to First Health. Indeed, testimony at trial indicated that First Health copied over 15,000 sheets of paper from DMAS' file in preparing its challenge to the award. This represents only 15-20% of the total DMAS documents made available to First Health. The only documents that were destroyed, based on the evidence presented, were the personal notes and preliminary scoring sheets of the selection committee members. Once the preliminary scores were transferred onto the official score sheets, the preliminary scores and notes were shredded. The court finds nothing improper in this procedure.

The requirement for adequate record keeping obviously exists so that unsuccessful bidders and reviewing entities, such as this court, will have a record from which to determine the basis for an award. The purpose is not to generate paper or to check for inconsistencies between preliminary comments and final action. Indeed, if committee members had to concern

themselves that every note they took, even notes to themselves, might be subject to later scrutiny, they would be greatly inhibited in their conduct. It is their final action and their final thoughts which matter. Preliminary notes and scores have no more business being retained or made public than lawyers' and judges' preliminary drafts of briefs and opinions. The court finds that the records kept by DIT are clearly adequate to comply with the applicable regulations.

The court also does not believe that instructions to committee members to shred their notes mean anything. Both First Health and EDS have consistently attempted to persuade this court, usually unsuccessfully, how proprietary and confidential their proposal information is. The evidence shows that they made the same assertions to DIT. The shredding of notes and preliminary scores not needed for final documentation was simply an attempt by DIT to protect the bidders' claims of required secrecy. As testified to by selection committee members, there was nothing in those notes and scores which was sinister or contrary to the documents which were kept. In sum, the court finds that no regulation or standard requiring adequate record keeping by DIT was breached. First Health's challenge in this regard is rejected.

As previously noted, First Health suggested that other regulations and procurement standards were also violated by DIT, but no specific regulations or standards, other than those discussed above, were cited. To the extent First Health claims that any other regulation or standard was violated, the court finds that First Health has failed to prove such violation.

### III. *Appearance of Impropriety*

First Health's final challenge to DIT's procurement award involves what First Health alleges is an appearance of impropriety surrounding EDS' selection. At issue is the role of Thomas Bone in the procurement process.

Thomas Bone was hired by DMAS as director of managed care in 1991. Managed care is another aspect of Medicaid which is related to, but not a specific part of, the contract at issue here. He later became director of DMAS' division of alternative health care. In December, 1993, he was one of many state employees who received letters from then Governor-elect Allen informing them that their jobs would be terminated and asking for their resignations. Bone initiated contact with EDS and was hired by EDS on January 27, 1994. This was after issuance of the RFP but before the contract was awarded.

Bone testified that while he was with DMAS, he participated in two meetings with representatives of EDS and someone from the managed care program in Arizona as part of DMAS' and DIT's preparation of the RFP. He further testified that his input at those meetings was minimal, and there is no evidence to the contrary. In fact, the meetings which he attended took place in August, 1993, and he had no further involvement with the RFP or procurement process at DMAS.

When he went to work for EDS in January, 1994, both Bone and EDS thought that Bone would be involved in EDS' bid for the DMAS/DIT contract. In fact, by letter dated January 11, 1994, EDS' vice president, Craig Venet, informed Bruce Kozlowski, director of DMAS, that EDS was about to hire Bone, and sought written approval from DMAS that Bone could legally work on EDS' procurement bid. Plaintiff's Exhibit 36. Kozlowski refused to give such approval, stating only that each case must be decided individually, and providing Venet with a relevant Attorney General opinion in a different case. Plaintiff's Exhibit 40. Venet wrote to Kozlowski again on January 27, informing Kozlowski that it was EDS' position that Bone *could* participate in its bid process, and suggesting strongly that he would be assigned "to work on the DMAS procurement." Plaintiff's Exhibit 42. DMAS' deputy director of operations, Joseph Teefey, who was also on the selection committee, responded to Venet as follows:

[T]here may exist, in some quarters, the perception that Mr. Bone participated in the construction of the RFP. Accordingly, I strongly urge you, for the benefit of the Commonwealth and this procurement, to obviate any such perception of conflict of interest, and to not utilize Mr. Bone in any facet of the EDS response to the DMAS Fiscal Agent RFP.

Plaintiff's Exhibit 46.

By letter dated February 25, 1994, Venet seemed to capitulate, and informed DMAS that Bone "has not and will not be involved in the preparation or development of the EDS response." Plaintiff's Exhibit 51. In spite of that assurance, however, Bone did participate as a "sounding board" during a rehearsal of EDS' oral presentation, and EDS informed DMAS that Bone would lead EDS' managed care team although, as previously noted, managed care was not a part of the RFP. There is no evidence that Bone took part in EDS' proposal in any other way.

Virginia Code § 11-74(4) provides, in pertinent part, that:

> [N]o public employee having official responsibility for a procurement transaction shall participate in that transaction on behalf of the public body when the employee knows that . . . .
>
> 4. The employee . . . is negotiating, or has an arrangement concerning, prospective employment with a bidder, offeror or contractor.

This provision does not apply for two reasons. First, the term "official responsibility" is defined by Va. Code § 11-73 as "administrative or operating authority, whether intermediate or final, to initiate, approve, disapprove or otherwise affect a procurement transaction, or any claim resulting therefrom." Bone's participation in two meetings in August, 1993, is nowhere close to fitting that definition.

Second, even if Bone is considered to have had official responsibility for the procurement transaction, there is no evidence that he participated in the transaction after beginning employment talks with EDS "*on behalf of the public body.*" Emphasis added. Notably, the statute does not prohibit participation in a procurement on behalf of a subsequent employer. Thus, this particular statute does not apply.

Also inapplicable is Va. Code § 11-76, which provides:

> No public employee or former public employee having official responsibility for procurement transactions shall accept employment with any bidder, offeror or contractor with whom the employee or former employee dealt in an official capacity concerning procurement transactions for a period of one year from the cessation of employment by the public body *unless the employee or former employee provides written notification to the public body, or a public official if designated by the public body, or both, prior to commencement of employment by that bidder, offeror or contractor.*

Emphasis added.

Thus, even if the court again assumes that Bone did have official responsibility for the subject RFP, something which the court specifically does not find, this provision does not apply since the required notice was given.

First Health's real argument with regard to an appearance of impropriety is based on Va. Code § 11-35(G), which provides:

> To the end that public bodies in the Commonwealth obtain high quality goods and services at reasonable cost, that all procurement procedures be conducted in a fair and impartial manner with avoidance of any *impropriety or appearance of impropriety*, that all qualified vendors have access to public business and that no offeror be arbitrarily or capriciously excluded, it is the intent of the General Assembly that competition be sought to the maximum feasible degree . . . .

Emphasis added.

While defendants contend that this section is "aspirational" only — that is, that it is unenforceable by itself — the court agrees with First Health that where an appearance of impropriety exists, a procurement award may be reversed. This is so because Va. Code § 11-70(C) allows reversal where an award is "not in accordance with . . . statutes." Section 11-35(G) is a statute, and procurement actions are supposed to be in accordance with it.

The court further finds that EDS' handling of Thomas Bone's employment did create an appearance of impropriety. Not only did EDS ignore DMAS' strong urging "to not utilize Mr. Bone in any facet of the EDS response" by having him participate in a rehearsal of its oral presentation, it actually submitted his résumé to DMAS and bragged to DMAS that he would be in charge of the managed care component of its bid. Plaintiff's Exhibits 36 and 119. In addition, when Bone's attempt to schedule a lunch meeting with his old supervisor, Joseph Teefey, was rejected by Teefey, Bone sent the following message to Venet:

> I just spoke with Joe. He doesn't want to meet with me until after [best and final offers are] completed. "You just never know who you'll see; and right now it's very touchy" were his words. Sorry. I would really have liked to discuss the future of managed care in Virginia with him!!! He does want to get together, but not right now.

Plaintiff's Exhibit 127.

While Venet insisted during his testimony that he knew nothing about Bone's attempted meeting with Teefey, such testimony is simply not credible in light of the substance and tone of Bone's written message to him. Again, the court finds that such actions do, indeed, create an appearance of

impropriety. This does not mean, however, that the award must be reversed. In fact, it will not be.

Va. Code § 11-70(C) provides that an award "shall be reversed only if the petitioner establishes" that one of the proscribed acts has occurred; in this case, an award made "not in accordance with the . . . statute[]" prohibiting appearances of impropriety. Section 11-70(C) does not say that where a proscribed act occurs the award *must* be reversed. The court believes that had the General Assembly intended that a violation of law require automatic reversal, it would have said so. It did not.

The court holds that where an unsuccessful bidder shows that a procurement award was made in the face of an *appearance* of impropriety, a *prima facie* case of *actual* impropriety is established. This shifts the burden to the agency to come forward with sufficient evidence to demonstrate that the apparent impropriety was illusory only, and that it did not have any actual impact on the selection process. Plaintiff, of course, can then attempt to rebut the agency's showing, and prove that an actual impropriety did exist.

In the present action, First Health has made out a *prima facie* case. The court, as previously stated, does find that EDS' attempt to use Thomas Bone's employment as a plus in the procurement process, as well as its actual use of Bone — albeit a minimal use — does create an appearance of impropriety. The court also finds, however, that the overwhelming evidence, some of which has already been discussed, completely destroys any notion that the award itself resulted from any impropriety. That evidence has not been rebutted.

DMAS was unhappy with First Health's existing system. It decided to replace it. EDS' proposed system was, even by First Health's account, technically superior to First Health's proposed system. Other states in which EDS had systems gave EDS glowing recommendations. States in which First Health had systems were very critical of First Health. The members of the selection committee, five of whom testified at trial, were all knowledgeable in their fields and, the court finds, sincere in their judgment that EDS' proposal was not just a little better than First Health's, it was far better than First Health's. In fact, using a scale of one to ten, the committee's average "raw unadjusted technical score" for EDS was 8.6. For First Health, it was 4.25. Plaintiff's Exhibit 86.

With regard to "touting" Thomas Bone as EDS' managed care expert, EDS' efforts were in vain since managed care was not even a part of the RFP, and each committee member who testified stated that no credit was

given for it. In fact, Edmund Butler, DMAS' information systems director and a member of the selection committee, testified that EDS' inclusion of Bone in its proposal was an "affront" to DMAS' own managed care program, and that, if anything, it had a negative impact on EDS' bid.

In sum, although the court agrees with First Health that EDS' handling of Thomas Bone's hiring — not the hiring itself — created an appearance of impropriety, the evidence clearly demonstrates that such appearance in no way tainted the selection process. The award will not be reversed.

The court notes that while criticizing EDS for hiring Thomas Bone during the procurement process, First Health attempted to hire Edmund Butler, a DMAS employee and selection committee member, around the same time. In addition, one of First Health's employees, Charles Teefey, who helped prepare First Health's proposal, is the brother of Joseph Teefey, DMAS' deputy director of operations and also a selection committee member. While the court offers no opinion as to the propriety of either of these actions, they are interesting to note in light of First Health's complaints about EDS and Thomas Bone.

## IV. *Contract Price*

Finally, the court feels compelled to comment on one other aspect of this case which, although not relied on directly for reversal by First Health at trial, was conspicuously raised in its pleadings. Specifically, the contract price bid by EDS and accepted by DIT is $45 million. First Health's bid price was $30 million. While such a difference is obviously substantial, First Health's failure to rely on it as a basis for reversal is apparently in recognition — and rightly so — of the fact that it is not the function of this court to select what it might think is the better, or more economical, contract. That is the job of the agency. The only function of this court is to determine, based on the evidence presented, whether the award complies with the law. The award here, whatever its price, does so. Anything else is beyond the court's control.